# IN THE SUPREME COURT OF IOWA

No. 09–1471

Filed July 1, 2011

**MARK PEAK,**

Appellant,

vs.

**ELLIS ADAMS** and **RACHEL ADAMS,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Muscatine County, James E. Kelly, Judge.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

Stephen T. Fieweger of Katz, Huntoon & Fieweger, P.C., Moline, Illinois, for appellant.

Robert T. Park of Snyder, Park & Nelson, P.C., Rock Island, Illinois, for appellees.

**WATERMAN, Justice.**

Iowa has a strong public policy favoring settlements. This appeal decides the enforceability of a "Release of All Claims" that plaintiff, Mark Peak, signed on the advice of his attorney. Peak broke his leg while helping defendants, Ellis and Rachel Adams, move furniture using a rented U-Haul truck. The liability insurer for U-Haul paid its policy limits of $20,000 to Peak and his attorney in exchange for a release that specifically named Ellis and arguably covered Rachel. When Peak sought additional compensation from another insurer for the Adamses, it denied coverage based on the release. Peak responded that the release was intended only to release U-Haul and its insurer, not Ellis or Rachel personally. Peak sued Ellis and Rachel, and the district court granted their motion for summary judgment, concluding the release, as written, barred Peak's claims against both. The court of appeals reversed, concluding that fact questions as to the intent of the parties precluded summary judgment. On further review, we determine the district court correctly granted summary judgment for Ellis based on the release, while fact questions preclude summary judgment for Rachel.

**I. Background Facts and Proceedings.**

The summary judgment record establishes the following facts as undisputed. Ellis and Rachel Adams are married to each other. On February 22, 2008, Peak, age thirty-six, was helping Ellis and Rachel move furniture into their new home in Muscatine, Iowa. A U-Haul rental truck was used to transport belongings from the Adams' old house. Peak had gone with Ellis and Rachel to pick up the rental truck and waited in the car while the two of them went into the rental office together. Peak's petition alleged:

4. That the defendants jointly and severely [sic] rented a moving truck in which to move their furniture from the previous residence to the new residence. On February 22, 2008, the defendants failed to remove accumulated snow in their driveway. As a result of their failure to remove the accumulated snow, the moving rental truck became stuck.

The defendants' answer admitted that "Ellis Adams rented a truck for use in moving to defendants' new residence and that the truck became stuck in the snow" and otherwise denied paragraph 4. We assume from the pleadings that the U-Haul rental agreement was signed by Ellis, but not Rachel. Peak admitted both Ellis and Rachel were "in a big hurry" to return the truck that afternoon to avoid being charged a second day for its use.

To help extricate the truck stuck on the snowy driveway, Peak placed a plywood board under a tire. Ellis was behind the wheel with Rachel nearby. Ellis accelerated, which shot the board into Peak's leg, causing severe bone fractures that required surgery. Peak's medical expenses ultimately exceeded $50,000, and he spent several months convalescing at the Adams' home.

In June 2008, Peak hired an attorney, Stephen Fieweger, to represent him. Fieweger had over twenty years experience practicing law in Illinois and Iowa. He had handled personal injury claims through trial for both plaintiffs and defendants, but by 2008 usually represented plaintiffs in personal injury claims. Most of his cases had been concluded through settlements that involved signing releases, including, at times, partial releases. Fieweger began negotiating on behalf of Peak with Country Mutual Insurance Company, which provided premises liability coverage to the Adamses under their homeowner's policy, as well as auto liability coverage. Country Mutual's adjuster informed Fieweger by letter dated July 8, 2008, that she was "dealing with U-Haul on 'their

right of reimbursement' letter for their $20,000.00 limit." Fieweger received a letter dated July 21, 2008, from Jessica Brau of Republic Western Insurance Company, stating that it is the "claims administrator for U-Haul." Brau asked Fieweger to provide more information regarding the accident and told him "our coverage is provided on an excess basis. At this early stage in our investigation, we are unaware if Mr. Adams had other insurance at the time of this accident."

Brau wrote Fieweger again on October 9, 2008. The letter stated:

Please be advised that our liability limits in Iowa are $20,000 for bodily injury. Therefore, we are willing to offer our limits of $20,000.00 for Mr. Peak's claim.

I have enclosed a release in the amount of $20,000.00. Please have Mr. Peak sign and date the enclosed release and return it to me via fax or mail along with a completed W-9 for your law firm. I will then issue the check to you and Mr. Peak.

The document entitled "RELEASE OF ALL CLAIMS" transmitted in this letter stated in part:

The Undersigned Mark Peak, being of lawful age for the sole consideration of Twenty Thousand and xx/100 Dollars ($20,000.00) to the undersigned in hand paid, receipt whereof is hereby acknowledged, do/does, . . . hereby release, acquit and forever discharge Ellis Adams, U-Haul Company of Iowa, Inc., . . . Republic Western Insurance Company, its parent and affiliated companies, employees, and agents, each of the independent U-Haul dealers, and all the employees, agents, principals, servants, successors, heirs, executors, administrators of each of those hereby released, and all other persons, firms, corporations, associations or partnerships and any other persons, firms, or corporations involved in the design, manufacture, maintenance, ownership and any and all aspects of the rental or sale of the U-Haul equipment involved of and from any and all claims, actions, causes of action, . . . which the undersigned now has or which may hereafter accrue . . . resulting or to result from the incident, casualty or event(s) which occurred on or about the 22nd day of February, 2008 at Muscatine, IA or during the investigation or settlement of this matter.

Fieweger mailed the Republic Western release to Peak and asked Peak to sign and return it to him. Peak had not graduated from high school and has difficulty reading. Fieweger did not explain the release to Peak. A friend showed Peak where to sign the release and would have read it to Peak if he had asked. Peak signed and dated the release October 17, 2008, and returned it to Fieweger. Fieweger signed an "ATTORNEY'S ACKNOWLEDGEMENT" at the bottom of the one-page release. His acknowledgement, also dated October 17, 2008, stated:

> I, s/Stephen T. Fieweger, attorney for s/Mark Peak hereby represent and declare that I have fully explained the foregoing Release to said persons, and they have acknowledged to me that they understand said Release and the legal effect thereof, and I have advised them to sign it. Furthermore, in consideration of my fee, I agree to abide by the confidentiality provision above.

Fieweger returned the executed release by mail to Brau. His transmittal letter dated October 21, 2008, stated, "I am enclosing the Release of All Claims and W-9 form signed by Mark Peak. Please issue a $20,000 check payable to 'Stephen T. Fieweger, attorney for Mark Peak.' Thank you for your cooperation in bringing this claim to a conclusion."

Republic Western forwarded a check dated October 22, 2008, in the amount of $20,000 payable to "Mark Peak and Stephen T. Fieweger, his attorney." The check stated it was in "FULL AND FINAL SETTLEMENT OF ANY AND ALL CLAIMS." Peak endorsed the check, which was cashed, and the proceeds were disbursed with Peak receiving $6000 after deductions for a medical lien and Fieweger's fee.

At this point, Fieweger had not disclosed to Republic Western that he intended to reserve any claim to proceed against Ellis or Rachel personally or Country Mutual to obtain additional compensation. Meanwhile, by letter dated October 16, Fieweger informed Country

Mutual that Republic Western had tendered its $20,000 policy limit and that he was "in the process of resolving the claim with that company." Fieweger asserted Country Mutual's auto liability insurance policy provided coverage for this accident under its "nonowned vehicle" provision and asked Country Mutual to disclose its policy limits. This letter was sent the day before Fieweger and Peak signed the Republic Western release and five days before Fieweger mailed that executed release back to Brau. It appears Fieweger overlooked the language in the release naming Ellis Adams as a released party and believed only U-Haul and Republic Western were discharged. The consequences of that oversight came to light in the weeks that followed.

Country Mutual obtained a copy of the release and denied coverage on grounds that the release discharged the liability of Ellis and Rachel. On December 19, 2008—two months after Peak and Fieweger had signed the October 17 release—Fieweger wrote Brau, stating:

> In September, you tendered to my client a Release and payment of $20,000 under your insured's, U-Haul, insurance policy. Unbeknownst to us you put language in the Release of All Claims that released Ellis Adams from any and all claims.
>
> As you are aware, Mr. Adams has additional insurance coverage with Country Mutual Insurance Company. I understand that someone from your company has forwarded a copy of the executed Release to Country Mutual. Country Mutual is now denying liability under its own insurance policy based on the executed Release. In my negotiations and discussions with you of this claim, we only intended to release U-Haul and Mr. Adams to the extent of coverage under the U-Haul policy of $20,000. At no time did you insist that Mr. Adams, individually, be released from any and all claims over and above the $20,000 available under this policy.
>
> Therefore, I am sending to you by way of fax and regular mail an Amended Release of All Claims executed by my client. This only releases Mr. Adams to the extent of his coverage of $20,000 under the U-Haul contract. It does not release him from any and all claims individually. Please

acknowledge in writing that this was the intent of the parties at the time in which we negotiated the settlement. Also please acknowledge in writing that the Amended Release of All Claims is accepted by Old Republic Insurance Company, Republic Western Insurance Company, U-Haul Company of Iowa, Amerco, and Nevada Corporation and each of its subsidiaries. If you will not acknowledge this in writing, I will tender back the $20,000 paid on the claim and will simply proceed to file suit against Mr. Adams, Mrs. Adams and U-Haul Company.

Please advise immediately.

The "amended" release Fieweger sent Brau with this letter put a line through Ellis' printed name and added in handwriting "Ellis Adams is released under his contract with U-Haul Company of Iowa, Inc., to the extent of his coverage under his contract of $20,000, Ellis Adams is not individually released for claims against him in Iowa." Republic Western refused to accept the amendment. Fieweger never returned any of the $20,000 settlement proceeds.

On January 5, 2009, Peak filed a common law negligence action against Ellis and Rachel Adams in the District Court for Muscatine County, alleging they were jointly and severally liable for negligence in their operation of the U-Haul rental truck and their failure to remove snow from their driveway. The Adamses denied liability in their answer and raised Peak's release as an affirmative defense. Ellis and Rachel filed a motion for summary judgment. The district court determined that "[t]he release is unambiguous, and therefore its terms are to be enforced." The district court granted defendants' motion for summary judgment and dismissed Peak's petition.

Peak appealed, and his appeal was transferred to the court of appeals. The court of appeals reversed, concluding that the circumstances surrounding the execution of the release raised questions of fact as to the parties' intent to release Ellis and Rachel.

We granted defendants' application for further review.

## II. Standard of Review.

Our review of a summary judgment is for correction of errors at law. *Huber v. Hovey*, 501 N.W.2d 53, 55 (Iowa 1993).

> [W]e ask whether the moving party has demonstrated the absence of any genuine issue of material fact and is entitled to judgment as a matter of law. The resisting party must set forth specific facts showing that a genuine factual issue exists. Summary judgment is proper if the only issue is the legal consequences flowing from undisputed facts.

*Id.* (citations omitted). Moreover, a "factual issue is 'material' only if 'the dispute is over facts that might affect the outcome of the suit.'" *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717 (Iowa 2001) (quoting *Fouts ex rel. Jensen v. Mason*, 592 N.W.2d 33, 35 (Iowa 1999)). As we elaborated in *Covenant Clinic*:

> In ruling on a summary judgment motion, the court must look at the facts in a light most favorable to the party resisting the motion. The court must also consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record. An inference is legitimate if it is "rational, reasonable, and otherwise permissible under the governing substantive law." On the other hand, an inference is not legitimate if it is "based upon speculation or conjecture." If reasonable minds may differ on the resolution of an issue, a genuine issue of material fact exists.

*Id.* at 717–18 (citations omitted) (quoting *Butler v. Hoover Nature Trail, Inc.*, 530 N.W.2d 85, 88 (Iowa Ct. App. 1994)).

### III. Did the District Court Correctly Grant Summary Judgment on Grounds the Release Discharged Peak's Claims?

The release Peak signed is a contract, and its enforcement is governed by principles of contract law. *Huber*, 501 N.W.2d at 55. Although Peak did not read the release, "[i]t is well-settled that failure to read a contract before signing it will not invalidate the contract." *Id.*

Peak had the opportunity to have a friend read the contract to him. His attorney had the opportunity to review the contract and, indeed, signed an acknowledgement that he had explained it to Peak. The other party to the contract, Republic Western, had no information to the contrary.

> Interpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect. Interpretation is reviewed as a legal issue unless it depended at the trial level on extrinsic evidence. Construction is always reviewed as a law issue.

*Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978). "In the construction of written contracts, the cardinal principle is that the intent of the parties must control, and except in cases of ambiguity, this is determined by what the contract itself says." Iowa R. App. P. 6.904(3)(*n*). In *Waechter v. Aluminum Co. of America*, we summarized the law regarding postaccident settlement agreements as follows:

> "The law favors settlement of controversies. A settlement agreement is essentially contractual in nature. The typical settlement resolves uncertain claims and defenses, and the settlement obviates the necessity of further legal proceedings between the settling parties. We have long held that voluntary settlements of legal disputes should be encouraged, with the terms of settlements not inordinately scrutinized."

454 N.W.2d 565, 568 (Iowa 1990) (quoting *Wright v. Scott*, 410 N.W.2d 247, 249 (Iowa 1987) (citations omitted)).[1]

**A. Ellis Adams.** Looking within the four corners of the release, we agree with the district court that the operative language by its terms

---

[1]By contrast, preaccident exculpatory clauses and liability waivers are frequently construed strictly against the party seeking the benefit. *See, e.g.*, *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 879–80 (Iowa 2009) (requiring clear and unequivocal language to effectively waive liability claims for future acts or omissions of negligence); *Maxim Techs., Inc. v. City of Dubuque*, 690 N.W.2d 896, 901–02 (Iowa 2005) (narrowly construing scope of indemnification agreement for future environmental liability claims and reviewing authorities).

unambiguously discharges Peak's claims against Ellis Adams. The October 17 release states:

> The Undersigned Mark Peak, . . . for the sole consideration of Twenty Thousand and xx/100 Dollars ($20,000.00) does, . . . hereby release, acquit and forever discharge Ellis Adams . . . from any and all claims, . . . which the undersigned now has . . . resulting . . . from the incident . . . on or about the 22nd day of February, 2008 at Muscatine, IA . . . .

Peak cannot show that the release is facially ambiguous as to Ellis Adams, but contends the surrounding circumstances generate a genuine issue of material fact as to whether the intent of the parties was to release only claims against U-Haul and its insurer, while reserving Peak's claims against Ellis Adams personally.

When interpreting contracts, we may look to extrinsic evidence, including " 'the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties.' " *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 466 (Iowa 2010) (quoting *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999)). The cardinal rule of contract interpretation is to determine the intent of the parties at the time they entered into the contract. *Id.* The most important evidence of the parties' intentions at the time of contracting is the words of the contract. *Id.* "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008).

The key is to ascertain the *mutual* intent of the two parties to the release—Republic Western and Peak. A contract requires a meeting of

the minds. *See Shaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002). The problem with Peak's position is that none of the extrinsic evidence raises an inference that *Republic Western* agreed the release did not mean what it said. Rather, Peak at most merely shows that, at the time he signed the release, he had an undisclosed, unilateral intent to reserve his right to sue Ellis personally to collect from Country Mutual. Such extrinsic evidence cannot alter the legal effect of the unambiguous contract language discharging Ellis from liability.

In *Waechter*, we reiterated that, "[w]hen we do interpret settlement agreements, our primary concern is to ascertain the intention of the parties." 454 N.W.2d at 568. Evidence of the parties' *mutual* intent is what matters:

> In searching for that intention, we look to what the parties did and said, rather than to some secret, undisclosed intention they may have had in mind, or which occurred to them later. In addition we are guided by another sound principle that has particular application to settlements: in the absence of an express reservation of rights, a settlement agreement disposes of all claims between the parties arising out of the event to which the agreement related.

*Id.* at 568–69 (citation omitted). It is undisputed that Fieweger never disclosed to Republic Western any intent to reserve Peak's claim against Ellis or Rachel Adams personally before the release was executed.

The context of Fieweger's negotiations with Republic Western does not help Peak. Under Iowa law, Peak's only cause of action was against Ellis or Rachel Adams personally. Peak never claimed the U-Haul truck was defective. Peak had no right to sue U-Haul because the vehicle owner liability statute does not impose liability on rental companies. Iowa Code § 321.493(1)(*a*) (2009) ("[I]f the vehicle is leased, '*owner*' means the person to whom the vehicle is leased, not the [titleholder]."). Nor did Peak have a right to sue Republic Western directly. *See* Iowa Code

§ 516.1 (allowing direct action against liability insurer only after obtaining a judgment against the insured that remains unsatisfied); *see also O'Kelley v. Lochner*, 259 Iowa 710, 717–18, 145 N.W.2d 626, 630–31 (1966) (direct action against liability insurer presupposes an unsatisfied judgment against its insured). From Republic Western's standpoint, a purpose of the settlement was to extinguish the liability of its insured, Ellis Adams, the U-Haul customer, who it specifically named in the release.

Republic Western paid its limits promptly because Peak's medical expenses of just over $50,000 were roughly two and half times the policy limits of $20,000. The size of the settlement did not signal a mistake as to the scope of the release because liability was disputed and a jury could have found defendants were not negligent or that Peak was more than fifty percent at fault for his accident, preventing any recovery. U-Haul itself had no liability exposure to Peak; nor did Republic Western itself have liability unless and until Peak obtained a judgment against its insured, Adams. Under these circumstances, it would make little economic sense for Republic Western to pay its full policy limits without obtaining a release of Peak's claim against Adams. Republic Western never told Fieweger it was only buying peace for U-Haul and itself, not the rental customer involved in the accident.

Peak's attempt to unilaterally "amend" that release two months later is ineffective and cannot show a mutual intent shared by Republic Western at the time it paid its limits. Iowa law permits reformation of a written agreement that fails to reflect the "true agreement" between the parties. *See Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 636 (Iowa 1996) (quoting *Kufer v. Carson*, 230 N.W.2d 500, 504 (Iowa 1975)). Reformation requires

> a definite intention or agreement on which the minds of the parties had met must have preexisted the instrument in question. There can be no reformation unless there is a preliminary or prior agreement, either written or verbal, between the parties, furnishing the basis for rectification or to which the instrument can be conformed.

*Id.* (quoting 66 Am. Jur. 2d *Reformation of Instruments* § 4, at 529 (1973)). Here, Peak is not entitled to reform the agreement because there is no evidence that Republic Western truly intended to pay its limits without a release of Ellis Adams personally.

The same failure of proof precludes relief under a theory of mutual mistake—the mistake here was unilateral on the part of Peak and his counsel. Iowa law permits a party to avoid a release only upon proof that *both* parties were mistaken about an essential fact. *Pathology Consultants v. Gratton,* 343 N.W.2d 428, 437 (Iowa 1984); *see also State ex rel. Palmer v. Unisys Corp.,* 637 N.W.2d 142, 150 (Iowa 2001) (noting a unilateral mistake does not avoid the contract absent fraud, misrepresentation, or other misconduct); *Wright,* 410 N.W.2d at 249–50 (requiring *mutual* mistake and finding the plaintiffs' "confusion after the settlement was made about how it might affect their claims against other parties was insufficient as a matter of law to vitiate the settlement agreement"). There is no evidence Republic Western misled Fieweger.

To allow a party to avoid a signed release based on a unilateral mistake would undermine the finality of settlements. We decline to do so. The district court correctly granted defendants' motion for summary judgment as to Ellis Adams.

**B. Rachel Adams.** We next determine whether Rachel Adams was entitled to summary judgment. She is not identified by name in the release. The release, however, expressly discharges the liability of persons who are "agents [or] principals . . . of those hereby released" and

persons "involved in . . . any and all aspects of the rental of the U-Haul equipment." Peak protests that he did not intend to release Rachel. Of course, he asserts he did not intend to release Ellis Adams either, and his failure to read the release does not avoid its effect, as we have noted earlier.

Whether the release sufficiently identified Rachel by description is governed by the Iowa Comparative Fault Act, Iowa Code section 668.7, which provides "[a] release . . . entered into by a claimant and a person liable discharges that person from all liability . . . but it does not discharge any other persons liable upon the same claim *unless it so provides*." (Emphasis added.) We have previously construed the language "unless it so provides" to require the release to "include some specific identification of the tortfeasors to be released in order for them to be discharged." *Aid Ins. Co. v. Davis Cnty.*, 426 N.W.2d 631, 632–33 (Iowa 1988). We noted that,

> [w]hile the easier course would require naming these parties, we would not require such a rigid rule if they are otherwise sufficiently indentified in a manner that the parties to the release would know who was to be benefitted. Such designations might include classes as "employees," "partners" or "officers." While this rule may at times require evidentiary hearings to determine the members of the class, it provides needed flexibility. Under this rule, a general designation such as "any other person, firm or corporation" would not sufficiently identify the tortfeasor to be discharged.

*Id.* at 633–34; *see also Britt-Tech Corp. v. Am. Magnetics Corp.*, 463 N.W.2d 26, 29 (Iowa 1990) (same). Thus, Iowa law permits the release to discharge Rachel's liability without naming her so long as she is "sufficiently identified" so that the parties to the release would know she is included. Something more than saying "any other person, firm or corporation" is required. *Aid Ins. Co.*, 426 N.W.2d at 634. Accordingly,

the "catch all" reference in the release to "all other persons" is ineffective to discharge Rachel's liability.  The fighting issue is whether Rachel is covered by the more descriptive language in the release that purports to discharge the liability of (1) "agents [or] principals . . . of those hereby released," or (2) "all other persons . . . involved in . . . any and all aspects of the rental . . . of the U-Haul equipment."  Defendants moved for summary judgment in Rachel's favor on both grounds; the district court granted her summary judgment on the agency theory.  We address each argument in turn.

1. *Did the defense establish an agency relationship between Ellis and Rachel as a matter of law?*  The district court noted a "potential ambiguity" as to whether Rachel is released "as principal for her husband Ellis Adams."  The district court relied on Peak's allegation Ellis and Rachel jointly rented the truck to conclude Rachel was covered by the release.  We disagree that the issue can be resolved by summary judgment.

Agency is generally a question of fact.[2]  *See Wilkins v. Marshalltown Med. & Surgical Ctr.*, 758 N.W.2d 232, 236 (Iowa 2008) (noting existence of agency is question of fact); *see also Spencer Concrete Prods. Co. v. City of Spencer*, 254 Iowa 87, 93, 116 N.W.2d 455, 459

---

[2]"The party asserting an agency relationship must prove its existence by a preponderance of the evidence."  *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 100 (Iowa 2011).  "Agency . . . results from (1) manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to the former's control and, (2) consent by the latter to so act."  *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 38 (Iowa 1977).  To establish agency, the agent must have actual or apparent authority to act on the principal's behalf. *Fed. Land Bank of Omaha v. Union Bank & Trust Co. of Ottumwa*, 228 Iowa 205, 209–10, 290 N.W. 512, 514–15 (1940). The Restatement (Third) of Agency states agency as arising "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) of Agency § 1.01, at 17 (2006).

(1962) ("It is also settled that agency is generally a fact question . . . ."). Rachel's marriage to Ellis is a factor to consider in determining if an agency relationship existed regarding the U-Haul rental, but it is not determinative. *See* 41 C.J.S. *Husband & Wife* § 87, at 464–65 (2006).

It is undisputed that Rachel accompanied Ellis when they picked up the U-Haul truck and joined him in the rental office. They used the U-Haul truck together on their joint marital endeavor to move shared belongings from their old residence to their new home. Peak testified that both Rachel and Ellis were in "a big hurry" to return the rental truck to avoid another day's rental charge. However, defendants' answer denied the allegation that Ellis and Rachel "jointly" rented the U-Haul. The pleadings thus left in dispute Peak's claim that Rachel "jointly" rented the U-Haul. There is no evidence Rachel signed the U-Haul agreement with Ellis.

On summary judgment, the court must view the facts in the light most favorable to the resisting party who is allowed every legitimate inference that can be reasonably deduced from the record. *Covenant Clinic*, 625 N.W.2d at 717–18. We conclude there is a genuine issue of material fact whether Ellis and Rachel were in an agency relationship within the meaning of the release. The district court erred in granting summary judgment on the basis of an agency relationship between Ellis and Rachel. The agency issue may be decided by the trier of fact on remand.

2. *Did the defense establish as a matter of law Rachel was "involved in . . . any and all aspects of the rental" of the U-Haul?* Alternatively, defendants contend that Rachel is released because she is a person "involved in . . . any and all aspects of the rental or sale of the U-Haul equipment."

We first examine whether this release language applies only to the U-Haul side of the rental counter or may include customers. Neither side offered extrinsic evidence on the meaning of this language. This issue therefore is for the court to decide. *Fashion Fabrics*, 266 N.W.2d at 25.

Guidance is provided by a canon of construction, *noscitur a sociis*, which "summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words." 11 Richard A. Lord, *Williston on Contracts* § 32:6, at 432 (4th ed. 1999) [hereinafter *Williston*]; *see also Fleur de Lis Motor Inns, Inc. v. Bair*, 301 N.W.2d 685, 690 (Iowa 1981) (" 'The rule of *noscitur a sociis* and the rule of *ejusdem generis* produce identical results in most situations.' " (quoting 2A Sutherland, *Statutes & Statutory Construction* §§ 47.16, 47.17 (4th ed. 1973)). " 'The maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings.' " *Williston*, § 32:6, at 433–34 (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S. Ct. 1579, 1582, 6 L. Ed. 2d 859, 863 (1961)).

The phrase at issue, "any and all aspects of the rental," follows a list of U-Haul-related parties and a series of terms that, until "rental or sale" refer to persons exclusively on the U-Haul side of the counter: "all other persons . . . involved in the design, manufacture, maintenance, ownership, and any and all aspects of the rental or sale of the U-Haul equipment . . . ." U-Haul's customers would not be involved in the "design, manufacture, maintenance, or ownership" of the equipment. Placement of the term "rental" after a series of terms applicable only to persons on the U-Haul side of the counter suggests "rental" belongs in the same class and does not refer to customers.

Perhaps the best evidence of the parties' intent is the fact the release names Ellis Adams, but not his wife, Rachel. Another rule of construction bearing a Latin name comes into play: *expressio unius est exclusio alterius*—"[T]he expression of one thing of a class implies the exclusion of others not expressed." *Maytag Co. v. Alward*, 253 Iowa 455, 460, 112 N.W.2d 654, 656 (1962) (noting this rule applies in the construction of contracts as well as statutes). Under this rule, the express mention of Ellis Adams by name, with Rachel omitted, raises an inference that the drafter did not intend to discharge Rachel's liability.

We are also troubled by the vague nature of the language "involved in . . . any and all aspects of the rental." The scope of this class of persons is unclear. Presumably, the persons signing the rental contract are included. Perhaps spouses accompanying the renter who share in the use of the equipment, such as Rachel, would be included as well, but once the drafter named Ellis without naming Rachel, it is ambiguous at best whether Rachel's liability is discharged. We generally construe ambiguous boilerplate language against the drafter. *See Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 555 (Iowa 1981) (citing *Rector v. Alcorn*, 241 N.W.2d 196, 202 (Iowa 1976) (resolving doubts concerning the meaning of the agreement against its drafter); *see also Huber*, 501 N.W.2d at 57–58 (reversing summary judgment for insurance broker who was not named in the release and rejecting argument that "the release should apply to all parties associated with the race"). U-Haul or its insurer as the drafter of the release was in a position to avoid any doubt whether it discharged Rachel's liability, simply by naming her along with Ellis as a released party.

Defendants are on the losing side of these rules of construction. We determine as a matter of law an unnamed person on the customer

side of the rental such as Rachel is not released by this language. Accordingly, we reject Rachel's alternative ground for summary judgment based upon her involvement in the rental.

### IV. Summary and Disposition.

We conclude the district court correctly granted summary judgment in favor of Ellis Adams, and we affirm the judgment in his favor. The district court, however, erred in granting summary judgment in favor of Rachel Adams. A genuine issue of material fact exists whether the release discharged Rachel Adams as an agent or principal of Ellis Adams. Accordingly, we reverse the district court's summary judgment as to Rachel Adams and remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.**

Costs of the appeal shall be taxed equally to the plaintiff and the defendants.

All justices concur except Mansfield, J., who takes no part.